UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Niki A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50119 |
| | ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

After graduating with a nursing degree, plaintiff worked as a registered nurse for 20 years for the Rockford Memorial Hospital. She started out as a cardiac telemetry nurse, a job she held for many years, and then became a charge nurse in the ICU, a very stressful job as the vocational expert later observed. R. 86 ("it's hard to find a job more stressful than that"). At some point, she was involved in a horrendous traffic collision. She identified this incident as the start of many of her current problems. However, after the incident, she continued to work for many years, but was forced to switch to less demanding administrative jobs within the hospital. In 2015, she stopped working altogether and applied for disability benefits, alleging that she suffered from fibromyalgia, migraines, and depression. (She was then 42 years old.) These problems caused pain and exhaustion. She stated that she gets tired after 30 to 60 minutes of an activity. To treat these problems, she saw a series of doctors, including a rheumatologist, a pain specialist, a neurologist, and two headache specialists. She took multiple medications, received injections, and did twice-weekly myofascial therapy for several years. She also received counseling for several years, but then stopped. (The reasons why are somewhat unclear.) Eventually, she

1

decided to try medical marijuana and found it was more helpful than traditional pharmaceutical medications. Despite some improvement from this newer approach, she continues to have headaches and fatigue and pain.

In 2018, the administrative hearing was held. The ALJ split the hearing into two parts. The first half covered the psychological impairments and the second half the physical impairments.[1] This approach was driven by the fact that the ALJ called an expert only regarding the mental impairments. This expert was Larry Kravitz, a psychologist. The ALJ had plaintiff testify first about her psychological symptoms. Dr. Kravitz then gave his opinion about this testimony. The ALJ made clear that Dr. Kravitz was there to opine only about the mental issues. *See* R. 66 (the physical problems are "not going to be considered by Dr. Kravitz"). Thereafter, plaintiff testified about the physical symptoms caused by the fibromyalgia and migraines. No expert was called to opine on these impairments.

Turning back to Dr. Kravitz, his testimony was a mixed bag. On the one hand, he largely agreed with the RFC later adopted by the ALJ—namely, that plaintiff could do light work with various limitations, such as doing only simple routine tasks. On the other hand, he made several statements suggesting he may have had some doubts. He repeatedly described plaintiff as an "emotionally fragile" person and, at the end of his testimony, gave the following summation: "So the question I would have is could she handle a work environment day in and day out, you know, 40 hours a week, I don't know. That's a question." R. 75, 76.[2] Not surprisingly, plaintiff highlights this statement in this Court.

---

[1] One lurking question is whether plaintiff's impairments, particularly the fibromyalgia, can be neatly categorized into only one of these two conceptual boxes.
[2] He also observed that plaintiff was uncomfortable testifying. *See* R. 66 ("I noticed sometimes when you're explaining something and you're speaking you stop and pause and you seem to get a little bit of a lost look on your face or a distressed look on your face."); R. 69-70 ("You do seem a bit on edge, a bit uncomfortable.").

On March 30, 2018, the ALJ issued a written decision. At Step Two, the ALJ agreed that all the alleged impairments—fibromyalgia, migraine headaches, and depression—were severe. Next, in the listings analysis, the ALJ noted that there was not a specific listing for fibromyalgia, but stated that he had evaluated plaintiff's fibromyalgia according to the "extensive and detailed guidelines set forth in SSR 12-02p." R. 22. But there was no real analysis or discussion of the evidence; it was mostly just a summary of the 12-2p standards. There was no discussion of tender points, for example.

In the RFC analysis, however, the ALJ took a more skeptical view of the objective evidence. The ALJ's multi-page summary of the medical treatment history from December 2014 to December 2017 emphasizes the normal examination findings and test results. At the end of this overview, the ALJ then assessed plaintiff's credibility in the following two paragraphs: :

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent with her reported activities of daily living. The claimant has reported that she cares for pets, attends to her personal grooming and hygiene, although slowly, prepares simple meals a few times a month, does housework and laundry, irons, pulls weeds, drives and shops in stores two to three times a month. She also relayed that she can pay bills, count change, handle a savings account, and use a checkbook and/or money orders, although with errors, attends social events one to three times per week, has visitors in her home three to four times per week, and attends church some weeks. She also estimated that she could correctly follow written directions 40 percent of the time and spoken instructions 50 percent of the time (Exhibit 13E). She also reports attending yoga classes for people with chronic illnesses weekly, receiving reflexology treatments, massage and reiki treatments, counseling with occasional eye movement desensitization and reprocessing treatment and hypnosis (Exhibit 5E). At the hearing, the claimant testified to taking a trip abroad with her family and entertaining her fiancé's seven-year old son (Hearing Testimony). Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. The claimant's ability to participate in such activities undermines the claimant's allegations of disabling functional limitations.
>
> The claimant's statements regarding her symptoms are also inconsistent with the medical evidence of record, which indicates imaging showing no acute brain abnormality and examinations demonstrating full range of motion, normal

> strength, tone, bulk, and reflexes, intact sensation, normal joint examinations in the extremities, no tenderness, swelling or pain with resisted motion, no focal neurological deficits and good hand grip and closure (Exhibits 1F at 18; 2F at 7-8; 3F at 11; 4F at 10, 15; 5F at 12; 7F at 14, 18, 21; 9F at 39; 12F at 12; 15F at 15). Moreover, despite claiming to be in considerable pain, the claimant consistently presented in no acute distress (Exhibits 3F at 7, 11, 18; 4F at 10; 12F at 12). What is more, the claimant was discharged form therapy, currently receives no mental health treatment, and takes no psychotropic medications (Hearing Testimony).

R. 31. These two paragraphs are the heart of the ALJ's decision. They set forth the three main rationales—plaintiff's ability to do daily activities, the lack of objective evidence, and the curtailment of treatments suggesting improvement.

The last relevant portion of the decision is the medical opinion section. It is fairly lengthy. The ALJ discussed multiple opinions from doctors and consultants. Consistent with the division of the case into mental and physical impairments, there were two sets of state agency opinions. We will not summarize the ALJ's discussion of each opinion but will note more generally that the ALJ did not adopt or agree in full with any of these opinions. Some were rejected entirely. The ALJ gave no weight to the opinions of the two state agency doctors who addressed the physical impairments. Other opinions were rejected in part. The ALJ rejected Dr. Kravitz's statement expressing doubt about plaintiff's ability to work 40 hours a week, but accepted the other parts of his testimony. In a few places, the ALJ's analysis is difficult to follow. The Court is not entirely clear on how the ALJ weighed the two state agency opinions addressing the mental impairments. But the larger relevant takeaway is that the ALJ's analysis of the specific pieces of evidence was largely a layperson analysis. In general, the ALJ relied on the same three credibility rationales in the analysis of the medical opinions. The ALJ stated, for example, that Dr. Kravitz's statement was inconsistent with plaintiff's daily activities, with her being "discharged from therapy," and with her not currently taking psychotropic medications. R. 34.

**DISCUSSION**

Although plaintiff organizes her arguments slightly differently, the Court finds that the best way to explain the decision to remand is to discuss the three key rationales one by one.

**I.      Objective Evidence**

Plaintiff's main argument for remand is that the ALJ misconstrued and overweighed the objective evidence, particularly relating to her fibromyalgia. Plaintiff asserts that the ALJ failed to appreciate that fibromyalgia may cause "symptoms out of proportion to the 'objective' medical evidence." Dkt. #16 at 12 (quoting *Johnson v. Colvin*, No. 13 C 1023, 2014 WL 2765701, *1 (E.D. Wisc. June 18, 2014)). Plaintiff specifically attacks the implicit premise made by the ALJ, which is the claim that fibromyalgia patients typically will have "limitations in strength, range of motion, or an inability to walk." Dkt. #16 at 13. Plaintiff disputes this assertion. Plaintiff also points out that fibromyalgia is a condition that "is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints." *Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014). Although plaintiff focuses mostly on fibromyalgia, she makes similar arguments regarding the other two impairments. Basically, plaintiff believes that the ALJ went through the record and mechanistically pulled out every "normal" finding without regard for whether they were relevant. In short, the ALJ engaged in the twin errors of cherrypicking and doctor-playing. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs should "rely on expert opinions instead of determining the significance of particular medical findings themselves").

The Court finds these arguments persuasive under the facts of this case. First. as a simple base-level observation, the Court notes that the ALJ never acknowledged these well-known points about the subjective and fluctuating nature of fibromyalgia symptoms. *See Heuschmidt v.*

5

*Colvin*, 2015 WL 7710368, * 8 (Nov. 30, 2015) (the ALJ "failed to note the fluctuating nature of fibromyalgia symptoms that SSR 12-2p describes"). Plaintiff contends that her symptoms waxed and waned. If so, this may explain some of the normal findings. It is possible that the ALJ considered this fact, but this contention cannot be assessed when there is no explicit acknowledgement of it.

Second, the ALJ did not distinguish between plaintiff's impairments. Some findings may be relevant to one but not another. In several places, such as in the credibility analysis quoted above, the ALJ merely included a laundry list of medical findings followed by a laundry list of record citations. While this string citation might seem impressive at first glance, it is less helpful in practice because it is not clear which piece of evidence relates to which impairment. To pick a simple example, having normal grip strength presumably would not be relevant to migraines.

Third, and most significantly, the ALJ extracted the normal findings from treatment notes without regard for the larger context, specifically without considering how the treating physician analyzed the same findings. This is where the doctor-playing concern arises most acutely. The Court will walk through one example, but the problem was recurrent throughout the ALJ's analysis and more examples could be given.

The example is plaintiff's visit to Dr. Dansdill on June 17, 2015. Dr. Dansdill was a rheumatologist, the specialty considered most relevant for fibromyalgia. The treatment notes are two and a half pages long. The ALJ summarized them as follows:

> On June 17, 2015, the claimant complained of feeling generally achy overall and again rated her pain at five out of ten. *Examination demonstrated no acute distress, normal joint exam throughout the upper and lower extremities, full active range of motion in the shoulders without pain and no tenderness or pain with resisted motions, no joint tenderness, swelling or loss of range of motion in the elbows, normal range of motion without pain in the wrists with no swelling, tenderness, redness or warmth, no joint tenderness or swelling in the hands, full range of motion without pain in the cervical spine and hips, no tenderness or*

6

> *palpable effusion in the knees and normal range of motion without pain or obvious synovitis in the ankles and no pain to palpitation in the feet.* The claimant's medications were again adjusted and she was advised to follow up in three months.

R. 26 (citations omitted) (emphasis added). This summary is predominantly about the examination findings. The very long italicized sentence catalogues the normal or negative findings. What is given very little attention in this summary is the diagnoses and treatment recommendations *based on these findings*. The ALJ only briefly covered these topics in the short concluding sentence, stating blandly that plaintiff's "medications were again adjusted." No details are given. One noticeable fact about this summary is that it leaves out an important actor—the doctor! But Dr. Dansdill's assessment is critical. He was the one with expertise to interpret the significance of his own findings. One gets a much different impression if Dr. Dansdill's assessments are considered. Here is a screenshot containing some of his analysis:

**Assessments**
1. Fibromyalgia - 729.0 (Primary)
2. Arthralgias - 714.9
3. Long-Term Use of Meds - V58.69
4. Myalgia - 729.1
5. LONG-TERM USE MEDS NEC - V58.69
6. SLEEP DISTURBANCE NOS - 780.50, no sleep apnea on sleep study
7. Headache - 784.0

**Treatment**
**1. Fibromyalgia**
Continue Cymbalta delayed release capsule, 60 mg, TAKE 1 CAPSULE BY MOUTH DAILY
Continue Lyrica capsule, 50 mg, 1-2 tablets, orally, at bedtime
Start Naltrexone Hydrochloride tablet, 50 mg, 3 tab(s) in 16.0 ounces of water and mix, refrigerate Take one TBSP or 1/2 ounce daily, orally, 3, Refills 3
Notes: Celebrex Famvir combo therapy discussed. Savella trial discussed but headaches a frequent side effect. Will try low dose naltrexone, discussed.

**2. Arthralgias**
Continue Tramadol, 50 mg, 1 tab, once to twice a day as needed
Continue Norco tablet, 325 mg-5 mg, 1 tab(s), every 4 hours-as needed

**3. Long-Term Use of Meds**
Notes: Patient Educated with: Which type of flu shot is right for you.pdf (Which type of flu shot is right for you.pdf).

**4. Headache**
Notes: She is going to U WIs Madison Headache center soon. They have her paperwork. She has had on Botox injection thru Dr Dahlbeg with some relief. Her headaches have prevented her from working. She is trying no gluten and dietary changes.

**5. Others**
Notes: Right piriformis. Stretches reviewed.

R. 429. The ALJ's summary gave the impression that plaintiff was basically fine at this visit. But this screenshot conveys a different picture. Medications are being prescribed, treatment recommendations are being made, and referrals to specialists are being considered. This all begs the question: if plaintiff had predominantly normal findings, then why did Dr. Dansdill prescribe these medications and why did plaintiff keep going to the doctor so many times over this period?

8

Fourth, the ALJ's RFC summary emphasizes the normal findings so heavily that it makes one wonder if plaintiff had any impairment at all. Yet we know from the earlier Step Two analysis that the ALJ found that plaintiff's three impairments were all severe. For the fibromyalgia, the ALJ made a finding that plaintiff met the fairly rigorous standards of SSR 12-2p. In short, the ALJ found there was *some* objective evidence. But this finding is in tension with the ALJ's later, more one-sided RFC discussion.

Fifth, plaintiff asserts also that the ALJ overlooked "ample evidence" of non-normal findings in the record, including evidence of musculoskeletal edema and tenderness. Plaintiff's opening brief includes a list to 21 record citations where this type of evidence can be found. Dkt. #16 at 12. On remand, the ALJ should consider this evidence. This Court will not attempt to assess this evidence here because it will have to be considered in any event by the ALJ and a medical expert on remand. Of course, plaintiff's claims about the record must be assessed with the same critical eye concerning possible cherrypicking and doctor-playing.

Sixth, one finding the ALJ relied on was a March 2015 brain MRI "showing no acute brain abnormality." R. 31. In plaintiff's opening brief, she argued that the reliance on this MRI was an error because it had no relevance to a person with fibromyalgia. The Government responded by pointing out that the MRI was "highly relevant to the assessment of her migraine headaches, which was what the ALJ was considering when addressing the MRI." Dkt. #19 at 5. In her reply, plaintiff did not attempt to rebut this argument, but she could have done so by citing to the following discussion by the Seventh Circuit:

> [T]he ALJ reliance on Moon's "unremarkable" 2008 MRI as evidence that her migraines were not a significant problem is not supportable. No doctor ever suggested that the MRI evidence meant anything about Moon's migraines, and for good reason. Doctors use MRIs *to rule out other possible causes of headache*— such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis. See "Migraines: Tests and Diagnosis," Mayo Clinic,

9

> http://www.mayoclinic.org/diseases-conditions/migraine-headache/basics/tests–diagnosis/con–20026358 (visited Aug. 13, 2014). This mistaken reading of the evidence illustrates why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.

*Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (emphasis in original). The same criticism is applicable here.

In sum, the Court finds that the ALJ's discussion of the objective evidence is insufficient because it is not adequately supported by medical testimony and because the evidence was not fully and fairly considered.

## II. Daily Activities

The ALJ's second main rationale was that plaintiff's activities, as she described them in written statements and at the hearing, were supposedly inconsistent with the way she described her symptoms. The paragraph setting forth this rationale is quoted above. The Court finds that this rationale suffers from two basic problems.[3]

First, the ALJ did not explain specifically how plaintiff's relatively modest and mundane activities were inconsistent with her statements. The ALJ did not identify which specific statements were considered to be inconsistent. The answer is not obvious. The ALJ's rationale rests on the implied premise that plaintiff portrayed herself as extremely incapacitated, unable to do almost any activity. But this is not a fair summary. Plaintiff stated that her symptoms waxed and waned and that she was usually able to do activities for 30 to 60 minutes at a time. The latter statement suggests she could have done activities around the home, especially if she had the flexibility to schedule them.[4] Many of the activities the ALJ cited are consistent with plaintiff's

---

[3] *See generally Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020) ("An ALJ may not equate activities of daily living with those of a full-time job. But an ALJ is not forbidden from considering statements about a claimant's daily life.") (citations omitted).

[4] *See Hamilton v. Colvin*, 525 Fed. Appx. 433, 438 (7th Cir. 2013) ("We have admonished ALJs to appreciate that, unlike full-time work, the 'activities of daily living' can be flexibly scheduled").

10

statements. These include personal grooming, caring for a pet, making simple meals a few times a month, being able to follow written instructions 40% of the time, and paying bills.

Second, the ALJ's description of plaintiff's activities was skewed in some cases. Some of these are relatively minor and could be overlooked under a harmless error analysis. These include the fact that plaintiff got help from the neighbors when feeding the pet or that she did not shower every day. But other descriptions are more prejudicial because the activities in question were arguably more probative. For example, the ALJ noted that plaintiff "has visitors in her home three to four times a week." R. 31. But the precise statement plaintiff made was that she socialized either by having visitors in her home *or by talking to them on the phone*. R. 312. This qualification makes the activity less demanding than the ALJ suggested.

The one activity that stands out as being the most demanding is the Paris trip. But here again the ALJ stripped out important explanatory details. Here is how plaintiff described this trip at the hearing:

> My mom, my mom paid for a trip to Paris and Amsterdam, and we were there like a week. And I really didn't want to go, I was scared to go, and we went and I think it was seven days. There was a family member there, and I just figured it was a once in a lifetime opportunity. I shouldn't have gone. I went anyway. Two of the seven days we were there I spent the whole day in bed sick and I brought triple the medicine I normally take. I took all of it. And then on the way home I vomited on the plane, from Paris to Illinois, and I wasn't right for like—I'm not sure I'm still right, and it was in the spring. I mean it almost killed me.

R. 84. The ALJ left out all these facts, except for a brief acknowledgement earlier in the decision that plaintiff was sick on the trip and did not enjoy it. R. 25. (In the later credibility analysis, the ALJ left out even these minimal facts.) But these contextual details matter. When they are fairly considered, it is difficult to see how this trip undercuts plaintiff's allegations. If anything, it bolsters them. The statement that the trip "almost killed" her speaks for itself. The ALJ did not

11

cite to any evidence, and this Court is not aware of any, casting doubt on plaintiff's description of the trip. The ALJ should have acknowledged these contrary facts.[5]

## III. Treatment

The third main rationale cited was that plaintiff was not receiving much treatment at the time of the hearing. The ALJ mentioned this rationale in the credibility analysis and then again in the medical opinion section. *See* R. 31 ("[T]he claimant was discharged from therapy, currently receives no mental health treatment, and takes no psychotropic medication."); R. 34 (rejecting part of Dr. Kravitz's statement because it was "inconsistent with the claimant's testimony that she was discharged from therapy and currently takes no psychotropic medications.").

Plaintiff argues that the ALJ overlooked "attempts to control [her] pain with years of treatment." Dkt. #16 at 15. Plaintiff further asserts that, despite some modest success with treatments such as Botox, she still had intractable headaches that caused vomiting and left her bedridden one to two times a month. *Id.* at 14.

This portion of plaintiff's argument is difficult to assess because the ALJ, in fact, did summarize some of this treatment history and also because the ALJ concluded that this earlier treatment was not as relevant in light of plaintiff's current treatment at the time of the hearing. The Court cannot categorically say that this overall approach was illogical. But the more concerning issue is whether the ALJ's summary of the facts was complete and fair. The ALJ

---

[5] The fact that plaintiff only took this one trip, described as a once-in-a-lifetime trip, distinguishes this case from others where the claimant regularly took long trips. *See, e.g.*, *Mitz v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("A further reason to doubt that the plaintiff's pain symptoms are totally disabling is her ability to run for an hour daily and run a 5,000–meter (3.1 mile) race and fly to and from Australia—very long flights (at least 20 hours each way), which a person with disabling pain would be likely to find extremely uncomfortable if he or she was traveling in coach, which so far as appears the plaintiff was. *Not the flights alone*, not the daily running alone, not even the 5,000–meter race alone, but the combination of all these things, is, the administrative law judge could reasonably conclude, inconsistent with having pain severe enough to preclude full-time employment.") (emphasis added).

suggested that plaintiff stopped most treatments because her problems had been addressed or were no longer bothering her. But this conclusion overlooks a critical part of her testimony.

It is true that plaintiff stopped taking psychotropic medications after trying them for several years. The ALJ emphasizes this fact, but the ALJ leaves out the explanation. Plaintiff stated that she was not getting relief and wanted to try alternative therapies.[6] Her main decision was to take cannabis in lieu of the traditional pharmaceutical medications she had been taking, but she also mentioned other measures. She explained at the hearing as follows:

> I take CBD oil, it's part of my, my stuff that I take, and I take, you know, a hot bath, a heating pad, I meditate, I, I just do anything to—I take a special class for people with disabilities for yoga. It's like a wheelchair accessible class. I try to do that because I think it's really important to stay moving. I do a lot of alternative therapies just because I've tried everything. I mean you can see I've tried everything. I just want to be as well as I can be, you know.

R. 81. Although the ALJ mentioned earlier in the decision that plaintiff was using medical marijuana, the ALJ seems to have forgotten this fact later in the analysis section. But this fact provides an explanation for a potentially significant gap in plaintiff's case.[7]

As for plaintiff's stopping counseling, the ALJ was entitled to rely on this fact. But a few caveats should be noted. First, this fact only relates directly to the depression, not the other two impairments. Second, on remand, the ALJ should explore the reason why plaintiff stopped counseling. The ALJ relied on plaintiff's testimony that she and the therapist mutually agreed to stop the counseling. This statement provides support for the ALJ's conclusion, but plaintiff's testimony was somewhat equivocal on why she stopped counseling. Here is the relevant exchange:

> A  I started seeing Kathryn, I can't think of her last name, she goes through Swedes, she's a really great lady, I started seeing her a couple years ago, I was going every week, I felt really good. She gave me a lot of great suggestions.

---

[6] Don't forget that she was a nurse with many years of experience.
[7] A separate question is how effective this new treatment was, which is a question to further explore on remand.

13

> We did like some anxiety work and it felt good, and we got to a point where it was kind of like—she's like call me if you need me, like I was in a good spot. And I think I started needing her and I didn't see that I needed her. [] I don't know why she stopped seeing me. If I just wasn't progressing or she just, you know what I mean.
>
> Q   So the therapist made a decision not to see you anymore?
>
> A   Well what, what she—what we agreed together, and I agreed with her, she kind of guided me and said I think we're good. If you think we're not good, you know, if you think—she said I think that we're good and you can just seem as needed, and I was like okay, and then I just decided that I was fine and I just tried to barrel through without her, and I think at some point I needed her and I needed to be open about stuff. I just wasn't doing it. I just wasn't doing it.

R. 56-57. This answer—particularly the statement about trying to "barrel through" without the therapist—leaves some doubt as to her condition at that time. The ALJ should investigate this question further on remand. More broadly, the ALJ should investigate possible reasons why all the different treatments were pursued or not pursued. The Court notes that plaintiff stated that she did myofascial therapy twice weekly for approximately three years, but stopped when her insurance ran out. R. 259.

The above issues are sufficient to order a remand. As a result, the Court need not address the remaining arguments, such as the ALJ's discussion of the medical opinions, because these arguments can be better considered on remand once the record is considered more fully. We have also not discussed other pieces of evidence that might be relevant but that did not play a major role in the arguments as currently presented here. This evidence includes the consultative examination report from psychologist Peter Thomas (Ex. 6F), a statement from plaintiff's mother (Ex. 12E), a neuropsychological evaluation done by psychologist Patricia Koltun (Ex. 6E), and a functional capacity evaluation (16F). But this evidence should be considered on remand along with all the other evidence. In remanding this case, the Court is not dictating that any particular

result be reached on remand, nor is it suggesting that the ALJ's current rationales could not be relied on if they were further developed and supported by a medical opinion.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: September 1, 2020      By: _____
                                              Iain D. Johnston
                                              United States Magistrate Judge